OPINION
Plaintiffs-appellants Steven L. Reed and Becky Reed appeal from the January 14, 2000, Judgment Entry of the Muskingum County Court of Common Pleas granting the Motion for Summary Judgment filed by defendants-appellees Armco, Inc. and Armco Advanced Materials Corp. (hereinafter referred to as "appellee").
 STATEMENT OF THE FACTS AND CASE
At all relevant times, appellant Steven L. Reed (hereinafter referred to as "appellant") was employed by appellee. Appellant had commenced his employment with appellee in 1979. In his complaint in the case sub judice, appellant contends that since the beginning of his employment, he has been subjected to repeated instances of harassment, threats and emotional and physical abuse, including the following incidents. During the early 1980s, appellant's ICS books were allegedly stolen from his locker by Mark Border, appellee's employee. After appellant caught Border red-handed with the books, which contained appellant's answers, appellant informed Jerry Hall, appellee's Manager of Human Resources, that Border had stolen the books. Hall testified during his deposition that appellant told him that "he felt Mark Border had stolen the books, stolen the answer sheets, plagiarized them and turned them into me." Deposition of Jerry Hall at 15. Although Hall told appellant that he would conduct an investigation, appellant testified during his deposition that Hall never informed him of the results of the same. As a result of his investigation, which involved closely comparing appellant's test results and Borders' test results, Hall concluded that Border had not plagiarized any of appellant's answers. Hall, however, was unable to determine who broke into appellant's locker. During his deposition, appellant also testified about an incident that occurred after appellant had reported the theft of his ICS books. Appellant testified that Bill Moyers, Jr., a co-employee, intentionally splashed crescent soap into appellant's eyes. According to appellant, [t]he incident of the ICS books came up as a topic. They [Bill Moyers and Mark Border] felt I was wrong going to management about it." Deposition of Steven L. Reed at 143. Later that day, appellant reported the splashing incident to Jerry Hall, who instructed appellant to go to the hospital. Appellant, when asked, denied telling Hall that the splashing was accidental. However, appellant was uncertain how he reported the incident the next day on appellee's safety report. After Ed Diamond investigated the incident at Jerry Hall's request, it was determined that "it was an accidental splashing, it wasn't done on purpose, it wasn't horseplay, . . ." Deposition of Jerry Hall at 18. Appellant also alleged that during 1992, he was locked in an approximately 9' by 15' storage room by Mark Border and Mark Fell, two of appellee's employees. After appellant pounded on the walls of the room with a metal bar while yelling, the storage room was unlocked by Gary Kirkbride, appellant's foreman. Appellant testified during his deposition that he did not have the opportunity to inform Kirkbride of the details of the incident since"[h]e chewed my ass out for being in there and told me to get to work." Deposition of Steven L. Reed at 163. Appellant, during his deposition, admitted that he failed to report the incident to any of appellee's other supervisors or managers. In 1994, appellant was physically hung from a C-hook on an overhead crane by Roy Preston, Kenny Knapp and Dick Andrews, three of his co-workers. Appellant was suspended from the hook for approximately ten minutes before he was let down by an employee in appellee's shop. Although appellant did not file a complaint with any of appellee's supervisors after this incident, he testified that he told Jabo Jalbrzikowski, a foreman, that he "was tired of being manhandled." Deposition of Steven L. Reed at 171. While appellant was unable to recall what he specifically told Jalbrzikowski, he testified that he told the foreman "the incident that happened and told him I didn't appreciate it very much." Id. Appellant never received a response from Jalbrzikowski. Both Jerry Hall and Jerry Stutz, appellee's Senior Personnel Representative, testified during their depositions that appellant never spoke to them about the C-hook incident. During his deposition, appellant also alleged that a number of other incidents of harassment occurred in 1994. Appellant alleged that, during one incident in December of 1994, Mark Border threw sunflower seed shells on appellant's computer equipment. Appellant, who was concerned that the shells, could damage the equipment, informed Ed Sterling and Pete Marty, appellee's supervisors, of the shell incident. At appellant's request, the shells were cleaned up by Mark Border. During his deposition, appellant testified that although Border never again threw or spit sunflower seeds in appellant's office, Border did subsequently throw or spit sunflower seeds at appellant. However, appellant never reported the incidents to any of appellee's supervisors since "[i]t didn't do any good before." Deposition of Steven L. Reed at 180. According to appellant, during the same month, Mark Border, Gary Kirkbride and, occasionally, Mark Fell threw bolts against appellant's metal office enclosure. Appellant, who was hit in the head by one of the bolts, testified that he reported the incident to Ed Sterling and Pete Marty, appellee's supervisors. Marty, appellant's direct supervisor, told appellant that "he better never catch anyone doing this stunt again or there would be consequences to pay" and that "he wasn't putting up with this bullshit." Deposition of Steven L. Reed at 183, 184. Although bolts were later thrown against his office, appellant did not report these later incidents to Pete Marty or any other members of appellee's management. Thus, neither Jerry Hall nor Jerry Sturtz were aware of the bolt throwing incident. Appellant, however, testified that he did inform Pete Marty of subsequent incidents during which Gary Kirkbride threw various types of fruit against the metal office enclosure. In the course of his deposition, appellant also testified that during the summer of 1994, Mark Fell and Mark Border tied appellant to his desk chair with duct tape on three separate occasions. On one occasion, appellant had his mouth covered with duct type and, therefore, was unable to yell for help. When asked whether he had reported the incidents to Pete Marty, appellant's supervisor, appellant testified during his deposition that he told Marty of the first incident but that he didn't report the other incidents since "[i]t didn't do any good after the first. Nothing happened." Deposition of Steven L. Reed at 199-200. According to appellant, "[a]ll that was said [by Marty] was, "I am not going to put up with this horseplay." It was always the same thing," I am not going to put up with this stuff. I will send you all home." That never happened, so it just continued on and on. What good did it do to keep going back to my supervisor and telling him? I just took that much more abuse because I went to him and told him the first time. I just took it double the next time." Deposition of Steven L. Reed at 200. When questioned, both Jerry Hall and Jerry Sturtz claimed that they had no knowledge of the duct taping incidents. Appellant also alleges that the instances of harassment continued during 1995. During the summer of 1995, Roy Preston and Ron Thomas lifted appellant off of his feet, placed his body in a large sink outside of the shower room and turned all of the faucets on, drenching appellant. Appellant testified that he did not report such incident to any of appellee's supervisors. Appellant also failed to report an alleged incident during which Roy Preston and Ron Thomas shoved appellant's head and body down a clothes hamper located in a locker room. According to appellant, during the fall of 1995, Steve Cannon, appellee's employee, physically threatened appellant for allegedly telling other employees that Cannon had stolen company property. Shortly thereafter, appellant went to Jerry Hall and told him that he "didn't appreciate being grabbed by another employee and being threatened." Deposition of Steven L. Reed at 228. After appellant reported the incident, Hall conducted a meeting at which both appellant and Cannon were questioned about the incident. When Hall asked appellant how the matter should be handled, appellant told Hall that he didn't want Cannon to lose his job or get suspended. At the conclusion of Hall's investigation, appellant and Cannon apologized to each other and shook hands. Appellant testified during his deposition that Hall's handling of the incident was satisfactory. During his deposition, appellant also alleged that, in January of 1996, as appellant was attempting to go into the shower room from the locker room, Jack Strong grabbed appellant by the penis while Roy Preston and Ron Thomas restrained appellant. After grabbing appellant's penis, Strong began pulling appellant by the penis in the direction of appellee's plant. Although appellant claims that appellee's management became aware of this incident, appellant testified that he did not report such incident to any of appellee's supervisors. Jerry Hall was not aware of such incident. The final incident that led to the filing of the complaint in the case sub judice occurred in late January of 1996. Appellant alleges that on January 25, 1996, he was confronted in the lunchroom at appellee's plant by Ron Thomas and Roy Preston. According to appellant, Thomas and Preston, who were appellant's co-workers, grabbed appellant by the arms and carried him out of the lunchroom to a golf cart in appellee's plant. The two then proceeded to shove appellant's head into the back of the golf cart. After Roy Preston unbuckled appellant's pants, appellant's jeans and underwear were pulled down below his knees. Appellant testified during his deposition that he then felt something rub against his rear end. When appellant freed himself and turned around, he saw Jack Strong "with his clothes pulled clear down below his knees, standing there swinging his dick around in a circle at me, laughing." Deposition of Steven L. Reed at 278. Appellant's co-workers, Bill Woods and Dave Smalley, observed either all or part of this incident. After appellant got dressed and was leaving, he warned those who were either involved in or who had witnessed the January 25, 1996, incident that "they better keep their mouth shut and not go around telling everybody in the goddamn plant what happened." Deposition of Steven L. Reed at 281. Once he became aware on approximately February 6th or 7th of 1996 that appellee's management was aware that something had happened in the plant, appellant again advised the same individuals to keep their mouths shut. Appellant, when he was approached by several employees, including several in management, about the January 25, 1996, incident, denied that the incident had ever occurred. After appellant advised a union official about the January 25, 1996, incident, Jerry Sturtz and Ed Diamond, two of appellee's representatives, approached appellant and asked him if he wanted to talk about such incident. Once appellant told the two what had happened on January 25, 1996, and who was involved, appellee began conducting a formal investigation. As a result of appellee's investigation, Jack Strong, Ron Thomas and Roy Preston were given lengthy suspensions. On January 22, 1997, as a result of the above incidents, appellant and his wife, Becky Reed, filed a complaint against Armco, Inc. Armco Advanced Materials Corp., appellee, Ron Thomas, Roy Preston, Jack Strong, Bill Woods, Roy Smalley, the Zanesville Armco Independent Organization, Inc., and the International Brotherhood of Independent Organizations in the Muskingum County Court of Common Pleas. With leave of court, an amended complaint substituting the National Federation of Individual Unions for the International Brotherhood of Independent Organizations as a defendant was filed on May 12, 1997. The amended complaint contained two counts against appellee. Count VI set forth a claim of intentional infliction of emotional distress whereas Count X set forth a claim for loss of consortium. Appellee, on July 31, 1998, filed a Motion for Summary Judgment to which appellants filed a response on August 14, 1998. Appellee, in its motion, argued that appellants' allegations could not meet the standard established in R.C.2745.01 for a plaintiff to defeat a motion for summary judgment in an employment intentional tort case. A reply memorandum was filed by appellee on August 26, 1998. Pursuant to a Decision and Journal Entry filed on September 3, 1998, the trial court denied appellee's motion, finding that there were "questions of fact on which reasonable minds could differ". On the same date, the trial court issued a Decision and Journal Entry finding R.C. 2745.01 unconstitutional. After the Ohio Supreme Court, in Johnson v. BP Chemicals, Inc. (1999), 85 Ohio St.3d 298, held that R.C. 2745.01 was unconstitutional, appellees, on September 10, 1999, filed a Motion for Reconsideration of its Motion for Summary Judgment. Appellants filed a memorandum in opposition to such motion on September 17, 1999, to which appellee filed a reply brief on October 7, 1999. Pursuant to a Decision and Journal Entry filed on January 14, 2000, the trial court granted appellee's Motion for Reconsideration and sustained appellee's Motion for Summary Judgment. The trial court, in its January 14, 2000, entry, specifically found that there was "no just cause for delay." It is from the trial court's January 14, 2000, Decision and Judgment Entry that appellants prosecute their appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
 BECAUSE THE REEDS' COMPLAINT ALLEGED BOTH PHYSICAL HARM AND EMOTIONAL DISTRESS CAUSED BY ARMCO'S EMPLOYER INTENTIONAL TORT, THE TRIAL COURT ERRED AS A MATTER OF LAW BY SUSTAINING ARMCO'S MOTION FOR SUMMARY JUDGMENT ON ALL THE REEDS' CLAIMS BASED UPON A FINDING THAT MR. REED DID NOT ESTABLISH ALL OF THE ELEMENTS NECESSARY FOR A CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.
ASSIGNMENT OF ERROR II
 WITH SUFFICIENT EVIDENCE OF RECORD TO PLACE AT ISSUE WHETHER ARMCO REQUIRED MR. REED TO WORK IN AN ENVIRONMENT WHERE ARMCO KNEW IT WAS SUBSTANTIALLY CERTAIN THAT HE OR OTHER WORKERS WOULD BE INJURED BY HORSEPLAY, THE TRIAL COURT ERRED BY FINDING OTHERWISE AND SUSTAINING ARMCO'S MOTION FOR SUMMARY JUDGMENT ON ALL OF THE REEDS' CLAIMS.
 STANDARD OF REVIEW
Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35,36. Civ.R. 56(C) states in pertinent part: Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. Vahila v. Hall (1997), 77 Ohio St.3d 421, 429, citing Dresher v. Burt (1966), 75 Ohio St.3d 280. It is based upon this standard we review appellants' assignments of error.
 I, II
Appellants, in their two assignments of error, challenge the trial court's award of summary judgment to appellee. Appellants specifically contend that the trial court erred in finding that there existed no genuine issues of material fact by which appellants could establish a claim in intentional tort or a claim of intentional infliction of emotional distress. We, however, disagree. In order to establish a prima facie case of a common law intentional tort, such as the tort of intentional infliction of emotional distress, an employee must demonstrate each of the following: "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus. There is an extremely high burden of proof to establish an intentional tort of an employer. As stated by the court in Fyffe: "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id. at paragraph 2 of the syllabus. Construing the evidence in favor of appellants, this court finds that the trial court did not err in granting appellee's Motion for Summary Judgment since appellants failed to establish the above elements necessary to prove an intentional tort. We specifically find that appellants cannot, as a matter of law, establish that appellee had knowledge of a dangerous process, procedure or instrumentality and that appellee knew that injury to appellant Steven L. Reed was certain or substantially certain to occur. As is set forth in detail in the facts above, appellant Steven L. Reed, during his deposition, testified, about numerous instances of alleged harassment that he contends occurred from the early 1980's through 1996. However, during his deposition, appellant conceded that he did not report a number of the incidents to appellee's management or to anyone in a supervisory capacity. Appellant testified that, in 1992, he was locked in a storage shed by Mark Border and Mark Fell, two of his co-workers. However, by his own admission, appellant did not report such incident to Gary Kirkbride, the foreman who freed him from the closet, or to any of appellees' other supervisors or managers. Appellant testified that he did not have the opportunity to tell Kirkbride what had happened since "[h]e chewed my ass out for being in there and told me to get to work" and that he did not tell any other supervisor or manager since "[i]f my foreman gave me a hassle, why go to anybody else?" Deposition of Steven L. Reed at 163, 164. Nor did appellant make a report to appellee's supervisors after he was placed in a washroom sink and laundry hamper by two of his co-workers and after Jack Strong pulled appellant by the penis in the shower dressing room. In addition, when appellant was questioned regarding the incident during which he was suspended by a C-hook, appellant testified as follows: Q. Did you file a complaint regarding this [C-hook] incident with any supervisor at Armco? A. I didn't file a complaint. I said something to Mr. Jalbrzikowski. Q. What information did you communicate to Mr. Jalbrzikowski regarding this incident? A. About the guys don't leave me alone. Q. You asked him to tell the guys to leave you alone? A. No. I told him that I was tired of being manhandled. Q. What do you recall specifically telling Supervisor Jalbrzikowski regarding this incident? A. I don't remember specifically what I told Mr. Jalbrzikowski. I went in and told him the indicent that happened and told him I didn't appreciate it very much. Q. Did you file — — did you feel satisfied with whatever Mr. Jalbrzikowski's response was regarding this information you provided him? A. I never really got a response. Deposition of Steven L. Reed at 170-171. Both Jerry Hall, appellee's Manager of Human Resources, and Jerry Sturtz, appellee's Senior Personnel representative, confirmed appellee's lack of knowledge of many of the incidents. During his deposition, Hall testified as follows: Q. Do you recall that he [appellant] talked to you about being attached by the belt loop to a C-hook and lifted up in the air? A. No. Q. Do you remember he talked to you about being put into a laundry hamper? A. No. Q. Do you remember that he talked to you about being duct-taped to a chair? A. No. Q. Do you remember he talked to you about having bolts thrown against his office? A. No. Q. Locked in a storage room? A. No. Q. Sunflower seeds put on his computer? A. He did not talk to me about that. Q. Somebody else did? A. Yes. Q. Okay. We'll come back to that. Put into a sink with cold water poured on him? A. No. Q. Grabbed by the penis while he was in the shower and pulled out of the shower? A. No. Deposition of Jerry Hall at 21-22. In turn, Sturtz testified as follows: Q. Okay. Are you aware that horseplay goes on in the plant? A. I am aware of a few incidents of horseplay in the plant. Q. You learned of the incident in the carpenter shop in January of '96; correct? A. Pardon me? Q. You learned of an incident in the carpenter shop in January of '96; correct? A. Yes, I did. Q. Prior to January of '96, had you heard that Mr. Reed had been in his office when people threw bolts at his office? A. No, sir. Q. Did you know he had been duct taped to his chair? A. No, sir. Q. Suspended in the air with a C-hook? A. No, sir. Q. Put into a laundry hamper? A. No, sir. Deposition of Jerry Sturtz at 13-14.
Our review of the record in the case sub judice reveals that when appellant Steven L. Reed did report other alleged instances of harassment by his co-workers to appellee's management, such instances were taken seriously and investigated by appellee. After appellant told him that Mark Border had taken appellant's ICS books, Jerry Hall, the Manager of Human Resources, investigated appellant's complaint. Hall testified as follows as to his investigation of such incident: There was a case where Steve Reed came to me and said, "Someone's been messing with my locker and took a bunch of stuff out, broke into my locker, took stuff out of my locker and threw it on the floor." So, Steve Reed and I discussed — — and what had happened was some of his ICS, International Correspondence books from his pipe shop apprenticeship were missing, and he told me that he felt Mark Border had stolen the books, stolen the answer sheets, plagiarized them and turned them into me. As always — — I typically inform the union. I would have informed Jon Bates [the union President] what was going on, investigated, as I normally would. Anyone that would bring a complaint to me, I would personally investigate it. I investigated his complaint, actually got all of Mark Border's ICS work out, got all of Steve Reed's ICS work out, starting comparing test per test, because we kept copies of them, letter per letter, to see if they — — if they were the same ones, which would give me a — — you know, whether I know whether they were plagiarized or not. My conclusion, after studying them very closely for a couple days, was that they were not plagiarized. In addition, I would have discussed the case with Mark Border in the presence of Jon Bates, and would have talked about it. Border denied it. I went back to Steve and said, basically, my investigation, there's no problem. Q. Your investigation, there's no problem? A. There was no — — there was nothing plagiarized out of the books that I could find. I did not find out who broke into his office — — or locker. I did ask questions, but did not find out.
Deposition of Jerry Hall at 15-16. Appellant also notified Hall immediately after the soap splashing incident involving Bill Moyer. According to Hall, appellant told him that he got soap in his eye as a result of "horseplay" in the shower. Deposition of Jerry Hall at 17. While Hall's investigation of such incident led him to conclude that the splashing was accidental, appellant, when asked during his deposition, was unable to say with any degree of certainty how he reported the incident on the company accident form. Appellant, during his deposition, also testified that he reported the first duct taping incident to Pete Marty, but that he did not report the second and third incidents since "[i]t didn't do any good after the first. Nothing happened. All that was said was 'I am not going to put up with this horseplay." Deposition of Steven L. Reed at 199-200. Marty, appellant's direct supervisor, was also informed by appellant when Mark Border allegedly threw sunflower seed shells on appellant's computer. Not only did Border clean up the shells, but after the incident was reported, Border never threw sunflower seed shells in appellant's office again. While appellant testified that Border subsequently did spit and/or throw seeds at appellant, appellant never reported such incidents to management. After appellant reported that bolts were thrown at his office enclosure, Marty told appellant that "he better never catch anybody doing this stunt again of there would be consequences to pay." Id. at 183. Appellant failed to report the later instances of bolt throwing to members of appellee's management. Furthermore, while appellant points out that he was physically threatened by Steve Cannon, he testified during his deposition that such incident was resolved by Hall to his satisfaction. Finally, while appellant did not immediately report the January 25, 1996, incident that led to the filing of the complaint in the case sub judice, once appellant reported such incident to management, an investigation was commenced and the proper individuals were disciplined. Based on the foregoing, we find that there is no evidence in the record that appellee knew of the existence of a dangerous process, procedure, instrumentality or condition within appellee's business operation. However, assuming, arguendo, that appellees knew that appellant was subjected to all of the above instances of harassment by his co-workers, we find that appellee was still entitled to summary judgment. Viewing the evidence in a light most favorable to appellants, we find that there is no evidence in the record that appellee knew that the injuries allegedly suffered by appellant as a result of the January 25, 1996, incident were certain or substantially certain to occur. See Fyffe, supra. The plaintiff in an intentional tort case has the burden of proving by a preponderance of the evidence that the employer had "actual knowledge of the exact dangers" which ultimately caused the employee's injury. Sanek v. Duracote Corp. (1989),43 Ohio St.3d 169, 172. In the case sub judice, none of the instances of physical harassment reported by appellant to appellee's management were of a similar nature to the incident that took place on January 25, 1996. The only incident that is arguably similar to the January 25, 1996, is the penis pulling incident that occurred earlier the same month. However, appellant, by his own admission, did not report such incident to any of appellee's supervisors or to anyone in a managerial position. Thus, as appellee notes in its brief, there is no evidence in the record that appellee knew that Ron Thomas, Jack Strong or Roy Preston, the employees involved in the January 25, 1996, incident, would physically assault appellant. Moreover, the history of horseplay in the case sub judice fails to establish that appellant's co-workers had a "sufficient propensity for violence" to place appellee on notice of possible harm to appellant, Steven L. Reed. See Jasinski v. Ford Motor Co. (1992), Cuyahoga App. No. 59760, unreported. In short, there is no evidence that appellee had "actual knowledge of the exact danger" causing appellant Steven L. Reed's injury. For the foregoing reasons, we find that the trial court did not err in granting appellee's Motion for Summary Judgment. Construing the evidence in favor of appellants, we find, as a matter of law, that appellants cannot prove the factors set forth in Fyffe, supra. to establish an intentional tort claim. Accordingly, appellants' two assignments of error are overruled.
The judgment of the Muskingum County Court of Common Pleas is, therefore, affirmed.
By Edwards, J. Farmer, P.J. and Wise, J. concurs